## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No. 24-cr-313 (JDB)** |
| **JACK CHAMBERS,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Jack Chambers has pleaded guilty to two second degree misdemeanors: a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Chambers to 30 days' incarceration and 36 months' probation on Counts Three and Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.    Introduction

Defendant Jack Chambers, a 25-year-old student and glazier, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power

after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Chambers pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four). The government's recommendation is supported by the defendant's entrance through the Parliamentarian door after it had been broken into several times.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Chambers' crime support a sentence of 30 days' incarceration and 36 months' probation in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ¶¶ 1–7.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Chambers' Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Jack Chambers made plans with a friend to travel from South Lebanon, Ohio to Washington, D.C. to attend the rally in support of then-President Trump. The two men traveled via car, sleeping in the car overnight, before arriving in Washington D.C. ECF No. 17 at ¶ 8. Chambers attended the rally at the Ellipse before joining the crowd that walked to the United States Capitol. ECF No. 17 at ¶ 9. He wore a navy padded jacket, a black face mask, a black Trump hat with white and blue lettering and an American flag patch on the left side, khaki pants, and dark sneakers with white soles. *See* Image 1.



*Image 1: Screenshot from CCTV showing Chambers (highlighted in red) inside the Capitol building at approximately 3:06:55 p.m.*

Chambers entered onto Capitol grounds on the West Front. From there, he climbed the stairs by the north scaffolding to reach the Upper West Terrace. Chambers entered the Capitol building through the Senate Parliamentarian Door at approximately 2:53:22 p.m. EST, less than twelve minutes after the Capitol building was breached in the same location for the second time. ECF No. 17 at ¶ 10. At least two United States Capitol Police officers were present in the hallway when he entered. *See Image 2.*

3



*Image 2: Screenshot from CCTV showing Chambers (highlighted inside red box) entering the Capitol at approximately 2:53:24 p.m. Two USCP officers are highlighted in yellow.*

Shattered glass was on the floor of the hallway by the Parliamentarian's Office, which

Chambers walked over, as shown in Image 3.



*Image 3: Screenshot from CCTV showing Chambers (highlighted inside red box) inside the Capitol building with shattered glass (highlighted in yellow) on the floor.*

From the Senate Parliamentarian Door, Chambers made his way through the halls on the first floor of the Capitol, down the Brumidi Corridor. At one point, he appeared to be caught in the crowd and was pushed along from behind. He passed by an exit to the North side of the Capitol building at approximately 3:01:17 p.m. EST. ECF No. 17 at ¶ 10; *see Images 4 and 5.*



*Image 4: Open-source photo showing Chambers (highlighted in yellow box) inside the Capitol.*



*Image 5: Screenshot from CCTV showing Chambers (highlighted inside red box) walking through the Brumidi Corridor at approximately 3:01:17 p.m.*

Chambers left the Capitol building through the Senate North Door at approximately

3:06:55 p.m. EST. ECF No. 17 at ¶ 10. *See Image 6.*



*Image 6: Screenshot from CCTV showing Chambers (highlighted inside red box) exiting through the Senate North Door at approximately 3:06:55 p.m.*

In total, Chambers was inside the Capitol building for approximately 13 minutes. ECF

No. 17 at ¶ 10.

<div align="center">

*Chambers' Interview with the FBI*

</div>

On July 28, 2023, Chambers gave a voluntary pre-arrest interview to the FBI. During the

interview, he admitted traveling to Washington with a friend after the friend invited Chambers to

attend the Stop the Steal rally on January 6, 2021.

Chambers said that after the rally, the crowd began to move toward the Capitol building.

Chambers said he went to the East side of the Capitol and was "sucked in with the crowd" into the

House of Representatives. This appears to be incorrect on two counts. First, Chambers entered

through the Parliamentarian Doors on the West side of the Capitol, on the Senate side of the

building. Second, Chambers was not "sucked" into the Capitol building "with the crowd." As seen

<div align="center">

6

</div>

above in Images 2 and 3, Chambers entered the Capitol building with plenty of space around him; he was not forced into the building.

During the interview, Chambers confirmed that he is the individual in Image 3. He stated that once he was inside the Capitol, he was separated from his friend. While he was inside the Capitol, he claimed that he did not see any violence or destruction of property. This does not appear to be true because he walked over shattered glass immediately upon entering the Capitol building. *See* Image 3, above. He also said that police officers were holding doors open for rioters and one officer gave him a high-five. There is no CCTV or body-worn camera footage or open-source video that corroborates that Chambers saw any such activity.

Chambers said that after about ten minutes, he got the sense that he should not be inside the Capitol building, fought against the flow of people, and exited near to where he entered. Chambers told the FBI that, after leaving, he was able to reconnect with his friend and the two drove directly back to Ohio. He stated that he had hoped that no one would find out he went inside the Capitol building.

*The Charges and Plea Agreement*

On July 25, 2024, the United States charged Chambers by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). On the same day, pursuant to a plea agreement, Chambers pleaded guilty to Counts Three and Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Chambers now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are both Class B Misdemeanors, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration and 36 months' probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Chambers' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Chambers, the absence of violent or destructive acts is not a mitigating factor. Had Chambers engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Chambers' case is that he joined the violent mob that broke into the Capitol building. Unlike the thousands of rioters on Capitol grounds on January 6

who participated in the riot without breaching the Capitol building itself, Chambers made his way from the Ellipse to the Capitol grounds, up to the Upper West Terrace, and through the Parliamentarian Door. He walked over broken glass when he entered the Capitol building, past police officers. He remained inside the building for over ten minutes as rioters overran police, and he passed by a door to exit but chose instead to continue further into the building for five minutes. Accordingly, the nature and the circumstances of this offense warrant a sentence of 30 days' incarceration and 36 months' probation.

### B.  Chambers' History and Characteristics

As set forth in the PSR, Chambers' criminal history is very limited, consisting of two traffic violations. Final PSR (ECF No. 22) at ¶¶ 24–25. Chambers is a student at Sinclair College and works as a glazier at his mother's window company. *Id.* at ¶¶ 46, 50. He has no reported mental health issues or history of substance abuse. *Id.* at ¶¶ 41–45.

Chambers contacted the FBI through his lawyer prior to arrest and took part in a pre-arrest interview. During that interview, Chambers identified himself. However, Chambers also minimized his behavior, claiming that he did not see any damage to the building even though he stepped over broken glass, and attempted to excuse his decision to enter the Capitol building by claiming that police officers were opening doors for rioters and giving high-fives. Chambers surrendered himself to the FBI when the arrest warrant was issued. Chambers has been compliant with his conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

*States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Chambers accepted responsibility by stipulating to all of the facts underlying his guilt, he has not expressed remorse

or denounced his actions on January 6, 2021, including to the Probation officer who conducted his PSR interview. In fact, he attempted to minimize his actions by claiming to the FBI that he did not see any damage to the building and that the police were opening doors for the rioters. The Court should therefore view any remorse with skepticism. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Chambers did not accept the results of the 2020 presidential election, so on January 5 he drove across state lines, attended the "Stop the Steal" rally, and joined a violent mob that invaded and occupied the Capitol. With the 2024 presidential election approaching, the potential for a repeat of January 6 looms ominously, as does the risk that Chambers will repeat his actions. The Court must sentence Chambers in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[2] This Court must sentence Chambers based on his own

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Chambers has pleaded guilty to Counts Three and Four of the Information, charging him with disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol in violation of 40 U.S.C. § 5104(e)(2)(D) and parading, demonstrating, or picketing in any Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jarrin*, 22-cr-00153 (RCL), the defendant pleaded guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) and 40 U.S.C. § 5104(e)(2)(G) (picketing, parading, or demonstrating in the Capitol building) in connection with entering the Capitol Building. Judge Lambert sentenced the defendant to 30 months' incarceration and 36 months' probation. Like Chambers, Jarrin ignored all the evidence that he should not enter the Capitol building. Jarrin, like Chambers, later minimized his behavior.

In *United States v. Victor Martinez*, 23-cr-00039 (TSC), the defendant pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) and 40 U.S.C. § 5104(e)(2)(G) (picketing, parading, or demonstrating in the Capitol building) in connection with entering the Capitol Building for 50 minutes. Judge Chutkan sentenced the defendant to 14 days of incarceration and 36 months' probation. Like Chambers, the defendant in *Martinez* was inside the building where police and rioters were engaging in skirmishes and lent his strength to the mob. Like Chambers, the defendant self-surrendered to the FBI but downplayed the events of January 6 during an FBI interview.

In *United States v. Paul Von Bernewitz*, 21-cr-00307 (CRC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (picketing, parading, or demonstrating in the Capitol building) in connection with his presence inside the Capitol building. Judge Cooper sentenced the defendant to 30 days incarceration. Like Chambers, the defendant in *Von Bernewitz* was on Capitol grounds and saw the mob gathering by the Capitol building before entering the Capitol building, passing by broken glass, and remaining inside the building for 14 minutes. Also like Chambers, the defendant in *Von Bernewitz* minimized his culpability during his interview with the FBI.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States*

*v Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Chambers must pay $500 in restitution, which reflects in part the role Chambers played in the riot on January 6.[4] Plea Agreement at ¶ 10. As the plea agreement

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Chambers' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* Final PSR at ¶ 8.

**VI.    Fine**

The defendant's convictions for violations of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G), (parading, demonstrating, or picketing in any Capitol building) (Count Four) subject him to a statutory maximum fine of $5,000 each for Counts Three and Four. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Here, the defendant has not shown an inability to pay, and the probation officer in this case has affirmatively found that Chambers does have the means to pay (Final PSR at ¶ 60), thus the Court has authority to impose a fine.

**VII.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration and 36 months' probation. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Chambers' liberty as a consequence of his behavior.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Carolyn Jackson*
Carolyn J. Jackson
Assistant United States Attorney
D.C. Bar No. 1644971
60 D Street N.W.
Washington, D.C. 20578
Carolyn.Jackson@usdoj.gov
(202) 252-7078

</div>